[Cite as *In re V.J.*, 2016-Ohio-5896.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                           |   | JUDGES:                       |
|---------------------------|---|-------------------------------|
| IN THE MATTER OF: V.J.    | : | Hon. Sheila G. Farmer, P.J.   |
|                           | : | Hon. W. Scott Gwin, J.        |
|                           | : | Hon. William B. Hoffman, J.   |
|                           | : |                               |
|                           | : |                               |
|                           | : | Case No. 2016CA00118          |
|                           | : |                               |
|                           | : |                               |
|                           | : | O P I N I O N                 |

CHARACTER OF PROCEEDING:   Civil appeal from the Stark County Court of
                           Common Pleas, Juvenile Division, Case
                           No. 2014JCV00520

JUDGMENT:                  Affirmed

DATE OF JUDGMENT ENTRY:    September 19, 2016

APPEARANCES:

For SCJFS                              For Mother

ALLISON TUESDAY                        MARY G. WARLOP
SCJFS                                  116 Cleveland Ave. N.W.
110 Central Plaza S, Ste. 400          Suite 500
Canton, OH  44702                      Canton, OH  44702

For Guardian Ad Litem                  For Father
HOLLY DAVIES                           BERNARD HUNT
101 Central Plaza South                2395 McGinty Rd. N.W.
Chase Tower, Suite 1000                North Canton, OH 44720
Canton, OH  44702

*Gwin, J.*

**{¶1}** Appellant-mother Latasha Humphries ["Mother"] appeals the May 18, 2016 Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, which terminated her parental rights with respect to her minor child, V.J. (b. May 28, 2014) and granted permanent custody of the child to appellee, Stark County Department of Jobs and Family Services (hereinafter "SCJFS").

*Facts and Procedural History*

**{¶2}** On June 2, 2014, SCJFS filed a complaint alleging the dependency and/or neglect of V.J. On August 20, 2014, the trial court found V.J. to be a dependent child and placed her into the temporary custody of SCJFS.

**{¶3}** On October 1, 2015, SCJFS filed a motion seeking permanent custody of the child. In its motion, SCJFS alleged, among other things, that the child could not or should not be placed with Mother within a reasonable amount of time, the child had been in the temporary custody of SCJFS for 12 or more months of a consecutive 22-month period, and permanent custody was in her best interest.

**{¶4}** On May 16, 2016, the Court held a trial on the permanent custody motion, Also pending at that time were Mother's motion to return and terminate and/or motion to change legal custody, and motion for home study on maternal aunt.

*Permanent Custody Trial.*

**{¶5}** On May 16, 2016, the trial court heard evidence on the motion seeking permanent custody of V.J.

**{¶6}** Caseworker Lynsey Overton testified Mother has a history of involvement with SCJFS. SCJFS became involved with Mother in 2002 regarding two children due

to the death of a third child. Mother agreed to change legal custody of those two children to a relative. Mother was involved with SCJFS again regarding two twin boys that she had. The two boys were placed in the permanent custody of SCJFS. Mother became involved with SCJFS again regarding her child R.H., Jr. He was also placed in the permanent custody of SCJFS. Mother became involved with SCJFS again regarding her child Cynthia who was also placed in the permanent custody of SCJFS. Mother was in prison when Cynthia was born. Mother was convicted of child endangering and spent five years in jail for the death of another child, Catana. The child died while in Mother's care. After Mother was released from prison, Mother worked a case plan and regained custody of one of her children until there were concerns about his behavioral issues and she requested SCJFS take custody of him. The child was then placed in PPLA status.

{¶7} Ms. Overton testified that Mother did engage in case plan services in this case. Ms. Overton opined that despite these services she had concerns about whether or not Mother was internalizing the skills that she was learning through her services providers. She stated that Mother is "able to provide me with ...with good answers but I cannot guarantee that she could keep [V.J.] safe."

{¶8} Mother's case plan requirements included a parenting evaluation at Northeast Ohio Behavioral Health, individual counseling and Goodwill Parenting classes. Ms. Overton testified that Mother completed a parenting evaluation through Northeast Ohio Behavioral Health. Ms. Overton testified that Mother is engaged in individual counseling at Minority Behavioral Health and has been for quite some time. Ms. Overton also testified that Mother completed Goodwill Parenting Classes with a Certificate of Participation. Goodwill parenting instructors recommended that Mother continue her

counseling and maintain a safe and appropriate home environment. The instructors also recommended that if reunification were to occur, then Mother should work with Goodwill Home Based Services.

{¶9} The caseworker further testified that she had recently been to Mother's home and Mother had baby gates and things for the baby. She stated that she had a couple concerns about things, however she had addressed those concerns with Mother and Mother was able to change the home to better accommodate the child.

{¶10} Ms. Overton testified that according to Mother's therapist, Mother was making progress. Ms. Overton further testified that Mother is employed and has stable housing. Mother has been in the same residence since Ms. Overton was assigned to the case.

{¶11} Ms. Overton also testified that Mother worked with a case manager at Minority Behavioral Health. Ms. Overton testified regarding Mother, "She's done everything on her case plan and engaged in it." (T. at 21). Throughout the course of the case, Mother visited with Victoria every other week for one hour. The caseworker has observed those visits. Ms. Overton testified,

> They're routine. I can tell you exactly what she's going to do ah every visit. Um there's no safety concerns but it's just ... it's the very same thing. She deviates very rarely from it. Ah she comes in…she greets Victoria. Um they go back to the visitation room. She either feeds her breakfast or a snack depending on whether she ate and then she does her hair. Or puts lotion on and she just (inaudible) with her clothes…and by the time all of that's over it's usually time to go.

T. at 21. Ms. Overton acknowledged that Mother interacts with Victoria during the visits and talks to her. Victoria reacts to Mother. There is a bond present. Everything Mother does with Victoria is appropriate. Mother comes prepared and brings appropriate supplies. Mother has brought age-appropriate music and movies to play for Victoria on her laptop.

{¶12} Regarding alternatives to permanent custody, Ms. Overton testified that Mother provided the name of her sister, Denice Roberson who lives in Florida as a possible placement option. SCJFS did not investigate her for potential placement. The caseworker explained that because the agency already had an "ICPC," the agency did not move forward with doing another one to investigate Ms. Roberson. Ms. Overton testified that she gave the sister information on how she could go about getting a private home study done.

{¶13} Mother's counsel called Sierra Dennis, a professional clinical counselor with Minority Behavioral Health group. She has worked with Mother since September of 2014. Mother provided the counselor with documentation from her case plan with SCJFS. Ms. Dennis began to meet with Mother weekly for therapy sessions beginning in October of 2014.

{¶14} Mother and Ms. Dennis went through three assessment phases to develop treatment goals and objectives and then worked on those goals and objectives. They worked on decreasing Mother's anxiety and worked on Mother's decision-making as well as her inner personal relationships.

{¶15} Ms. Dennis testified that she and Mother worked on processing Mother's grief and loss of Catana as well as her loss with her other children and the relationship with her other children.

{¶16} Ms. Dennis was provided with collateral information including the SCJFS case plan, and the reports from Northeast Ohio Behavioral Health and Goodwill Parenting Class.

{¶17} Mother and Ms. Dennis have continued to meet weekly. Mother has been on time and consistent with her appointments. Ms. Dennis also accompanied Mother to meetings with SCJFS. Ms. Dennis testified that Mother has made great progress over the past year and half. She also testified that she observed some of Mother's visits with V.J. and they went well. Ms. Dennis opined that Mother is internalizing the progress in counseling.

*Best Interest Hearing.*

{¶18} Regarding the best interests of the child, Ms. Overton testified that V.J. had been in the same foster home since removal. The foster parents are interested in adopting V.J. The agency conducted an out of state home study on a paternal uncle, which was approved in May of 2015.

{¶19} V.J. has visited the paternal relatives in Missouri. At the beginning, the paternal relatives came to Ohio to visit V.J. for short visits. In October of 2015, V.J. started going to Missouri for one week per month. The visits go very well and V.J. has a bond with her paternal relatives. The paternal relatives are interested in adopting V.J.

{¶20} Mother also provided Denice Roberson as a potential out of state relative placement. The agency did not conduct a home study on Ms. Roberson because they

already had an approved ICPC with the paternal relative. However, the caseworker informed Ms. Roberson that she could contact her local children services agency to conduct a home study.

{¶21} Regarding Mother's interactions with V.J., the caseworker again testified that Mother visits consistently with V.J. and the visits go fine. During those visits, Mother provides the care that she needs to provide for the child. There is a bond between the child and Mother. Mother has been actively involved in Victoria's doctor's appointments.

{¶22} On May 18, 2016, the trial court issued its findings of fact granting permanent custody of C.H. to SCJFS and terminating Mother's parental rights.

*Assignments of Error*

{¶23} Mother raises two assignments of error,

{¶24} "I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES (SCDJFS) AS SCDJFS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT GROUNDS EXISTED FOR PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶25} "II. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES (SCDJFS) AS SCDIFS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTERESTS OF THE MINOR CHILD TO GRANT PERMANENT CUSTODY AND SUCH DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

### Burden of Proof

**{¶26}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), *quoting Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972). A parent's interest in the care, custody and management of his or her child is "fundamental." Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982). The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id.

**{¶27}** An award of permanent custody must be based upon clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

### Standard of Review

**{¶28}** The Ohio Supreme Court has delineated our standard of review as follows,

Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the

requisite degree of proof.  See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).  A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established."  *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

{¶29}  In *Cross*, the Supreme Court further cautioned,

> The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts.  The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself.  Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value.  *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.*  See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478.  (Emphasis added).

## Requirements for Permanent Custody Awards

{¶30} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶31} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶32}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**Mother's First Assignment of Error: Parental Placement within a Reasonable Time- R.C. 2151.414(B) (1) (a).**

**1. The child had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months – R.C. 2151.414(B)(1)(d).**

**{¶33}** In the case sub judice, the trial court found, pursuant to R.C. 2151.414(B)(1)(d) that the child had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months.

{¶34} "Before a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22–month period." *In re: C.W.*, 104 Ohio St.3d 163, 2004–Ohio–6411, 818 N.E.2d 1176 at paragraph one of the syllabus. When calculating this time period, the court in *C.W.* cautioned, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12–month period set forth in R.C. 2151.414(B)(1)(d)." Id. at 167, 2004–Ohio–6411 at ¶ 26, 818 N.E.2d at 1180. Accord, *In re: N.C.,* 5th Dist. No. 2011-CA-00141, 2011-Ohio-6113, ¶32.

{¶35} In the case at bar, the grant of temporary custody of V.J. to SCJFS occurred on August 20, 2014. The motion for permanent custody was filed on October 1, 2015. Thus, V.J. had been in the temporary custody of SCJFS for at least 12 months of a consecutive 22-month period at the time the motion for permanent custody was filed. Mother has not challenged the twelve of twenty-two month finding.

{¶36} This finding alone, in conjunction with a best-interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. No. 2008CA00118, 2008–Ohio–5458, ¶ 45. *Accord In re H.P.*, 12th Dist. Preble No. CA2010–07–010, 2011–Ohio–1148, ¶ 42; *In re C.E.,* 3rd Dist. Hancock Nos. 5–09–02, 509–03, 2009–Ohio–6027, ¶ 18; *In re D.J.,* 2nd Dist. Montgomery No. 21906, 2007–Ohio–6677, ¶ 23; *In re Donell F.,* 6th Dist. Lucas No. L–04–1308, 2005–Ohio–4175, ¶ 25.

{¶37} Further, the trial court's finding that V.J. could not be placed with Mother within a reasonable period was not against the manifest weight or sufficiency of the evidence.

**{¶38}** The trial court further found V.J. could not be placed with Mother within a reasonable period of time and should not be placed with Mother pursuant to R.C. 2151.414(E). R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with a parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with [the] parent within a reasonable time or should not be placed with either parent"

**{¶39}** R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging

abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;

(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.052907.07, 2907.08, 2907.09, 2907.12, 2907.21,2907.22, 2907.23, 2907.252907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.

(7) The parent has been convicted of or pleaded guilty to one of the following:

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

**{¶40}** Caseworker Overton testified that Mother was convicted of Child Endangering (R.C. 2919.22) and served five years in prison. R.C. 2151.414(E)(6). The victim of the crime committed by Mother was a sibling of V.J. The child died while in Mother's care.

**{¶41}** In the present case, Mother has had parental rights involuntarily terminated with respect to a sibling of the child. R.C. 2151.414(E)(11). Caseworker Overton testified that Mother has involuntarily lost permanent custody of four children.

**{¶42}** Accordingly, the trial court's finding that V.J. would be at risk if she were to be returned to Mother is not against the manifest weight or sufficiency of the evidence.

**Mother's Second Assignment of Error: The Best Interest of the Child.**

**{¶43}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶44}** The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424(8th Dist. 1994). A finding that it is in the best interest of a child to terminate the parental rights of one parent is not dependent upon the court making a similar finding with respect to the other parent. The trial court would necessarily make a separate determination concerning the best interest of the child with respect to the rights of the mother and the rights of the father.

**{¶45}** The trial court made findings of fact regarding the child's best interest. It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re: Mauzy Children*, 5th Dist. Stark No. 2000CA00244, 2000 WL 1700073(Nov. 13, 2000), *quoting In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424(8th Dist. 1994).

**{¶46}** As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* 5th Dist. Stark No. CA–5758, 1981 WL 6321 (Feb. 10, 1982). "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record, *Miller v. Miller*, 37 Ohio St.3d 71, 523 N.E.2d 846 (1988).

**{¶47}** In the present case, the trial court's decision indicates it considered the best interest factors. Upon review of the record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in V.J.'s best interest. The trial court concluded the child's need for legally secure placement could not be achieved without awarding permanent custody to SCJFS.

**{¶48}** During the best interest portion of the trial, Caseworker Overton testified that V.J. is a healthy, developmentally on track child. V.J. is bonded and extremely attached to her foster family. The foster family wants to adopt V.J. V.J. has also had

brief visits with her paternal uncle and his family. She is also bonded to that family. Likewise, they are interested in adoption. In the opinion of Caseworker Overton, permanent custody is in V.J.'s best interest.

{¶49} In contrast to her foster family and paternal family, Ms. Overton described the bond between the child and Mother as "routine." She based this opinion on Mother's lack of adaptability throughout visits with the child as well as their interactions. According to Ms. Overton, Mother does not comprehend cues the child gives her signaling that she wants to play, and falls into the same routine during all of her visits. She believes that V.J. would benefit from adoption, and that benefit far outweighs the risk of harm due to the severing of Mother's parental rights.

{¶50} Ms. Holly Davies, Guardian ad Litem for the child, also agreed that permanent custody was in V.J.'s best interest.

### Conclusion

{¶51} For these reasons, we find that the trial court's determination that the child could not be placed with Mother within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that the trial court's decision that permanent custody to SCJFS was in the child's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶52} Because the evidence in the record supports the trial court's judgment, we overrule Mother's two assignments of error, and affirm the decision of the Stark County Court of Common Pleas, Family Court Division.

{¶53} Mother's first and second assignments of error are overruled.

{¶54} The judgment of the Stark County Court of Common Pleas, Family Court Division is affirmed.


By Gwin, J.,

Farmer, P.J., and

Hoffman, J., concur